1  WO

2

3              IN THE UNITED STATES DISTRICT COURT

4                  FOR THE DISTRICT OF ARIZONA

5

6  Kevin Brad Pennington,            )   No. CV 10-190-TUC-HCE
                                     )
7            Plaintiff,              )   **ORDER**
                                     )
8  vs.                               )
                                     )
9                                    )
   Michael J. Astrue, Commissioner of the)
10 Social Security Administration,   )
                                     )
11          Defendant.               )
                                     )
12 _____  )

13

14       Plaintiff has filed the instant action seeking review of the final decision of the

15  Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Magistrate Judge has

16  jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).

17       Pending before the Court are Plaintiff's Opening Brief (Doc. 11) (hereinafter

18  "Plaintiff's Brief"), Defendant's Opposition to Plaintiff's Opening Brief (Doc. 12)

19  (hereinafter "Defendant's Brief"), and Plaintiff's Reply Brief (Doc. 13) (hereinafter

20  "Reply").   For the following reasons, the Court grants Plaintiff's request to remand this

21  matter for further administrative proceedings.

22  I.    PROCEDURAL HISTORY

23       On January 10, 2006, Plaintiff protectively filed with the Social Security

24  Administration (hereinafter "SSA") application for disability insurance benefits under Title

25  II and XVIII of the Social Security Act alleging inability to work since August 8, 2005 due

26  to temporomandibular joint disorder (hereinafter "TMJ" or "TMD") on "both sides of [his]

27  jaw, depression, anxiety,..." and arthritis in both jaws. (TR 114-16, 136, 141).  Plaintiff's

28  application was denied initially and on reconsideration. (TR. 51 and 56-59).

Plaintiff then requested a hearing before an administrative law judge. (TR. 60). The matter was set for hearing on September 26, 2007 before Administrative Law Judge (hereinafter "ALJ") Norman R. Buls. (TR. 73). At the hearing, Plaintiff appeared without council and testified before the ALJ. (TR. 526-40). On October 25, 2007, the ALJ denied Plaintiff's claim. (TR. 32-34). Plaintiff appealed, and, on April 11, 2008, the Appeals Council remanded the matter to the ALJ for further proceedings. (TR. 28-32). Thereafter, Plaintiff obtained counsel. (TR. 95-97). A hearing was held on December 16, 2008, wherein Plaintiff and vocational expert Ruth Van Vleet testified. (TR. 543-60). On May 29, 2009, the ALJ again denied Plaintiff's claim. (TR. 12-26). Plaintiff appealed and, on March 15, 2010, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's May 29, 2009 decision the final decision of the Commission. (TR. 3). Plaintiff then initiated the instant action.

II.     PERTINENT PORTION OF THE RECORD ON APPEAL

    A.     Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on August 1, 1965. (TR. 114). He was 40 years of age on his alleged onset date of August 8, 2005, and 43 years of age on the date of the ALJ's decision in May 2009. (TR. 25, 114). Plaintiff is married and has no minor children. (TR. 115, 530, 544).

When Plaintiff was 14 years of age, he was in a motorcycle accident. (TR. 532). He suffered a fractured jaw, fractured skull, and broke his pelvis in three places (TR. 532-33). As part of his treatment, he received a TMJ implant. (TR. 533).

Plaintiff completed high school. (TR. 149, 544). In 2002, he completed training for a commercial driving program. (TR. 149).

Plaintiff has served in the army. (TR. 142 (indicating Plaintiff served in the army from 1990 to 1991); TR. 167 (indicating that Plaintiff served in the army from 1984 to 1994)). Plaintiff has performed various jobs, including truck driver, laborer, and utility worker. (TR. 159, 167, 214-20, 545-46; Plaintiff's Brief, p.5). On the alleged date of onset, Plaintiff worked as a semi-truck driver hauling hazardous material and explosive compounds

throughout the Southwestern United States. (TR. 159, 532). Plaintiff testified that in August 2005, he experienced "shooting nerves down my left arm, and the pain was getting worse in his jaw joints." (TR. 534). He is right handed. (TR. 530). Plaintiff testified that he experiences pain in "the sides of my head, my TMJ area onto the nerves of my left shoulder and arm down into my right leg." (TR. 546). He also testified that he experienced nerve issues from clenching caused from the aggravation of driving an 18-wheeler of 80,000 pounds. (TR. 534). He further testified that his doctor advised him to contact the Industrial Commission and Social Security and when he so informed his employer, he was told he was "fired as of the 9th[]" of August 2005. (*Id.*).

Plaintiff has no cartilage in his jaw bones and "[t]here is nothing but scar tissue." (TR. 534). He "wear[s] an appliance every evening to put the scar tissue back up in there." (*Id.*).

Cold weather and tension exacerbate Plaintiff's pain. (TR. 551-52). His pain most days is 5-7 out of 10 with medication and 8 or 9 out of 10 without medication. (*Id.*).

Plaintiff rises about 5:00 or 6:00 a.m., eats a light breakfast, takes his medication and does jaw exercises and stretching to help relieve his pain. (TR. 547-48, 552). Plaintiff helps take care of his bed-ridden grandmother, father, and feeds and waters his dogs with assistance from his wife. (TR. 179; *see also* TR 548). He goes for walks and enjoys fishing and hunting. (TR. 182, 549). He has difficulty sleeping due to pain and lays down during the day. (TR. 551). Plaintiff finds it difficult to stay focused on tasks and has problems with his memory. (TR. 225, 553-54; *see also* TR. 549).

Plaintiff had been pursuing vocational rehabilitation but his counselors "advised me that I have so many physical problems that they closed my case due to the severities of my physical problems." (TR. 553).

Plaintiff believes his physical impairment and lack of ability to focus render him unable to work full time. (TR. 554).

B.    Medical Evidence

1.    Physical Impairment

In 1979, when Plaintiff was 14 years of age, Plaintiff was in a motorcycle accident and suffered bilateral fractures of the mandibular condyles which required surgery and jaw implants. (TR. 307, 399, 442-43). He developed TMJ as a result of his injuries and, due to a recall of the implants he had received, he had another jaw surgery in 1992. (TR. 306-10). Plaintiff was symptom-free for a number of years. (TR. 323, 354). However, in 2005, Plaintiff was involved in an accident. (TR. 354-355). "As a result of the accident he began to experience jaw pain, cervical pain and lower back pain." (TR. 355).

a.    Medical Sources Who Treated Plaintiff

In August 2003, Plaintiff had his first appointment with Gary Muncy, M.D. (TR. 323). Plaintiff informed Dr. Muncy about his prior jaw injury and resultant surgeries. (*Id.*). Dr. Muncy noted that Plaintiff "is doing well with that now, no real problems with TMJ's [sic] at this time. He mentioned briefly he had some low back pain but did not go into that in detail." (*Id.*). Dr. Muncy's assessment was high cholesterol and history of low back pain. (Id.).

In April, 2005, Dr. Muncy performed a physical examination for purposes of Plaintiff's commercial driver's license and completed a form. (TR. 320). However, Dr. Muncy failed to include information in the form about Plaintiff's jaw injury. (TR. 319). On July 27, 2005, Plaintiff requested that Dr. Muncy include information on the form about Plaintiff's accident in 1979. (*Id.*). Dr. Muncy noted that Plaintiff suffered "neck strain and facial fractures" as a result of the accident. (*Id.*). Dr. Muncy's notes also reflect that Plaintiff "has had no sequela from that [injury] over the years, no treatment, etc." (*Id.*).

On August 10, 2005, Plaintiff presented to Dr. Muncy complaining of chronic jaw pain. (*Id.*). Dr. Muncy believed that Plaintiff was

> hoping to get some Disability in regards to that. I see no reason why that would be appropriate. His injury is non-work related and it should not prevent him from performing normal work. He is not dependent on his voice of [sic] jaw movement for his work in any way that I can discern.

(*Id.*).

On August 24, 2005, Plaintiff returned to Dr. Muncy complaining of TMJ pain and left shoulder pain. (TR. 318). After examination, Dr. Muncy's assessment was left TMJ pain and possible impingement of the left shoulder. (*Id.*). Dr. Muncy also indicated that he

> filled out a Disability Paper today where I mentioned that he qualified probably for most any kind of work he is trained for. I see no reason why he can't work. He describes pain while bounding around driving trucks that primarily affects his jaw, but I don't really see how that should keep him from working. I was very straight forward and open with pt. regarding what I put in the form. I also advised him to F/U with the surgeon who did his TMJ surgery since I am not an expert in that field and don't really know what else might be useful for him.

(*Id.*). Dr. Muncy recommended x-rays and physical therapy. (*Id.*).

On October 4, 2005, Plaintiff saw Dr. Muncy with complaints of TMJ and left shoulder pain. (*Id.*). Plaintiff reported that he had "not gone to Physical Therapy. He lost his insurance. Also did not get his medication for his high cholesterol." (*Id.*). They "[h]ad an extensive discussion regarding cholesterol and its treatment" and risk factors. (*Id.*). Dr. Muncy noted that Plaintiff "[i]s a heavy alcohol drinker who binge drinks up to 30 beers a day. Currently only drinking 1-2 alcoholic drinks a day." (*Id.*). Dr. Muncy assessed: [l]eft shoulder pain, probably mechanical", left TMJ and high cholesterol. (*Id.*). He planned for further work up once Plaintiff got his insurance. (*Id.*).

On October 12, 2005, Plaintiff saw Stephen J. Harkins, D.D.S., for complaints of jaw-related pain. (TR. 384-98). Dr. Harkins' "tentative diagnosis" was:

> Jaw/facial/head/neck myalgia (R=L)
> TMJ arthrosis/arthritis (osteo) (R=L)
> Cervical spine arthrosis/arthritis
> Tooth clenching
> Cephalgia
> Cervicalgia
> Neuropathic pain
> Malocclusion

(TR. 384). Dr. Harkins noted that "[b]ased on history, Mr. Pennington's chronic TMD was aggravated by his job as a truck driver." (*Id.*). Dr. Harkins recommended: a semi-soft diet; self-administered physical therapy and jaw exercises; limited jaw opening; anti-inflammatory, analgesic, and muscle relaxant medications; orthotic appliance therapy in the

form of splints; behavior modification and stress management such as biofeedback; dental equilibration after the symptoms are reduced and stable; "possible" physical therapy with a physical therapist; and "possible" TMJ lavage/arthrocentesis. (*Id.; see also* TR. 313).   On October 17, 2005, Dr. Harkins indicated that Plaintiff was totally restricted from work until his pain was under control.  (TR. 383).

On October 25, 2005, Plaintiff saw Dr. Muncy for follow-up regarding TMJ pain and high cholesterol.  (TR. 313).  Dr. Muncy prescribed medication to treat Plaintiff's high cholesterol, and 800 milligrams of Ibuprofen and 600 milligrams of Skelaxin for muscle tension in the jaw.  (*Id.*). He ordered a CT scan and plain x-rays of Plaintiff's "TMJ's [sic] bilaterally."  (*Id.*).

A November 2, 2005 CT scan showed degenerative changes of the jaw and dislocation on the right side.  (TR. 315).

Plaintiff returned to Dr. Muncy on November 30, 2005, and reported that his symptoms had not changed although "his left shoulder hurts a little less than it did the last time he saw me."  (TR. 314).  Plaintiff reported that he was unable to pursue physical therapy because he had no insurance for that.   (*Id.*).   Dr. Muncy continued Plaintiff on anti-inflammatories and muscle relaxants and reviewed the list of recommendations that Dr. Harkins thought might help.  (*Id.*).

On December 7, 2005, Dr. Muncy completed a form indicating that Plaintiff could return to regular duty work as of October 25, 2005.  (TR. 460).

On January 4, 2006, Dr. Harkins inserted upper and lower appliances into Plaintiff's mouth.[1]  (TR. 380-81, 458).

On February 28, 2006, Dr. Harkins indicated that Plaintiff could not return to work until his neck is treated and he is stable.  (TR. 379, 452).

---

[1]The record suggests that the Dr. Harkins inserted splints.  (*See* TR 327 (indicating Plaintiff saw Dr. Harkins for treatment including splints); TR. 362 (indicating Plaintiff used splints)).

On March 29, 2006, Plaintiff saw Debra Walter, M.D., upon referral from Dr. Harkins. (TR. 327-28). Plaintiff "describe[d] intermittent sudden pain in the left arm from the cervical thoracic junction to the elbow but increases with reaching certain directions...[and] constant low-grade discomfort around the deltoid insertion. It can sometimes last for several hours but has decreased since he stopped driving heavy transportation trucks...." (TR. 327). He also reported experiencing left shoulder pain for years but on the eighth of August 2005, it worsened considerably while he was driving for work. (*Id.*). Plaintiff stated that he "takes ibuprofen or Percocet sometimes for neck and shoulder pain" and that exercises prescribed by Dr. Harkins were "useful." (*Id.*). On examination, Plaintiff while standing had a "low left shoulder", full lumbar and cervical range of motion. (*Id.*). His cervical mobility was good but there was mild deep cervical paraspinal tenderness. (*Id.*). Plaintiff's left shoulder showed mildly positive signs of impingement and his "shoulders move[d] slowly.". (*Id.*). Straight leg raising was negative, and Plaintiff exhibited normal reflexes, normal strength, and "surprisingly good but slightly restricted" mouth opening. (*Id.*). Dr. Walters' impression was:

1. Impingement left shoulder with moderate intermittent symptoms.
2. Probable myofascial tightness neck and upper trapezius secondary to both the impingement and chronic temporomandibular joint problems.
3. Doubt cervical radiculopathy.
4. His symptoms and examination did not seem to call for much intervention at this time but his history is difficult to fully understand and I have no records.

(TR. 328). She recommended stretching exercises for Plaintiff's neck and shoulder for him to try at home and intermittent anti-inflammatories. (*Id.*). She also planned to discuss Plaintiff's situation with Dr. Harkins. (*Id.*).

On August 10, 2006, Dr. Harkins indicated that Plaintiff could not return to work. (TR. 376, 449). On August 25, 2006, Dr. Harkins indicated that: Plaintiff was totally disabled from performing his previous work; Plaintiff could not perform work that involved driving; and Plaintiff could perform light work with standing, sitting, and walking breaks up to eight hours per day. (TR. 377; *see also* Defendant's Brief, p.7). Plaintiff could use both his hands for repetitive movements. (*Id.*).

On November 21, 2006, Dr. Harkins noted that Plaintiff was unchanged from his previous report. (TR. 369). Dr. Harkins also recommended a vocational rehabilitation evaluation. (*Id.*).

On May 24, 2007, Dr. Harkins noted that Plaintiff had

> been in TMD/OFP therapy...since 10/12/05. He...is moderately improved (70%) over his pretreatment status. He continues to report intermittent Jaw/TMJ pain (R&L), Headache (R&L), TMJ crepitus (R&L), Neck ache (R&L), Limited jaw opening. He continues taking narcotic pain medication (Darvocet/Tramadol) prescribed by his physician.

(TR. 423). Dr. Harkins rated the permanent TMD impairment for Plaintiff at 26% of the whole person. (TR. 424). He restricted Plaintiff to a semi-soft diet, limited jaw opening, limited talking if talking caused pain. (*Id.*). Dr. Harkins also restricted Plaintiff from driving motor vehicles or dangerous equipment if he was taking pain medication. (*Id.*).

On December 11, 2007, Dr. Harkins recommended that Plaintiff "should avoid driving or operating equipment that will cause bouncing or jarring his jaw and neck. He should also avoid long periods of talking." (TR. 444). Dr. Harkins further noted that due to the effects of Plaintiff's pain medication (Darvocet and Tramadol), muscle relaxant (Skelaxin) and anxiety medication (Xanax), which can cause sedation or cognitive impairment, Plaintiff should also avoid driving or operating potentially dangerous equipment, "climbing steps and ladders, walking on elevated walkways and ramps or be in a situation where he can fall or drop objects on other people. He essentially needs to have a job that creates no risk to himself or others if he is taking medications. His restrictions are permanent." (*Id.*).

In May 2008, physician's assistant Mark R. Scott, PA-C, indicated that he has seen Plaintiff

> since July 2006 for his multiple medical problems. He has been diagnosed with Traumatic Brain Injury syndrome, Chronic Temporal Mandibular joint syndrome secondary to trauma, and Degenerative joint disease in his shoulders[,] arm and back, all of which I have been monitoring since 2006. He regularly sees his specialist as planned and follows their recommendations to my knowledge. He is currently being treated with physical and pharmaceutical therapies with little improvement expected.

(TR. 472). Physician's Assistant Scott was of the opinion that Plaintiff could not work due to his physical and mental issues. (*Id.*).

In December 2008, Physician's Assistant Scott indicated that there has been no change in Plaintiff's symptoms since May 2008 and Plaintiff remains unable to work "due to his impairment at this time." (TR. 471).

On January 19, 2009, Dr. Harkins wrote a letter to Plaintiff's attorney wherein he stated that Plaintiff takes narcotic pain medication, Hydrocodene/Acetominophen every four hours and a muscle relaxant, Skelaxin every eight hours, on a daily basis to control his chronic pain. (TR. 474). Dr. Harkins clarified that, in his December 11, 2007 letter expressing opinions concerning Plaintiff's condition and job restrictions, he

> did not include or consider pre-existing cognitive or psychological issues. My opinions regarding work restrictions/limitation were based on his jaw/head/neck pain issues and on his ongoing need to take medication that can cause sedation and cognitive impairment. I have observed Kevin on numerous occasions and his memory is poor. His cognitive functioning is also poor. I have not reviewed neuropsychology records or spoken with a neuropsychologist regarding Mr. Pennington's cognitive status. My opinions are based on my observation of Mr. Pennington and my experience in treating patients for thirty-two years.

> Adding his physical limitations (TMD)/back pain and need to take cognitive impairing medications with his pre-existing cognitive impairment, his limitations for future employment would be even more restricted. Knowing that Mr. Pennington has considerable physical limitations and poor cognitive/memory function, his potential to cause property damage, injure himself or others while working is high.

> In my opinion, within reasonable medical/dental probability, Mr. Pennington is a very poor candidate to hold long-term employment of any kind and will be a risk to himself and others.

(TR. 474).

### b.    Examining Physicians

On February 23, 2006, Plaintiff was examined by John Wenaas, D.M.D., of Arizona Oral and Maxillofacial Surgeons, (TR. 362-64). Dr. Wenaas noted that Plaintiff was

> [a]t most times...stable without pain, has a good range of motion, and is able to function extremely well. At different times he has had some obscure pains in his left shoulder and his right leg. In speaking with Dr. Stephen Harkins, he feels the nerve problem in Mr. Pennington's shoulder is related to neck problems. As far as I can tell they are unrelated to the TMJ situation, even though when he wears his splint they seem not to exist.

> ***

> [T]he stress involved with his profession as well as bouncing up and down in a large truck carrying explosives could create an onset [sic] his TMJ condition over time. The reasons this could happen are with his joint changes that leads to changes in his bite. The reason Dr. Harkins is using splint therapy is to maintain a balance in [Plaintiff's]...bite and relieve pressure off of the joints. The progression of his joints since the proplast was removed and his bite is somewhat stabilized is status quo. This will remain the case as long and [sic] he manages his stress level appropriately. I feel that he is not a candidate for further joint surgery since he is essentially stable in his current condition.

(TR. 362-63). Dr. Wenaas did not believe that Plaintiff's "nerve problems with his arm and leg..." were related to his joint problem. (TR. 363). Dr. Wenaas opined that Plaintiff's condition was stationary as long as Plaintiff did not experience stress or trauma. (*Id.*). He further opined that Plaintiff could perform any work "that is not physically traumatic nor stress inducing. This could be any job that would fit those limitations." (*Id.*).

Plaintiff saw Dr. Wenaas again on October 4, 2006. (TR. 360-64). Plaintiff reported that his discomfort had lessened since he stopped truck driving. (TR. 360). Dr. Wenaas stated that:

> The physical limitations for Mr. Pennington are obviously that of joint impact from bouncing and other similar movements. He is able to perform in other capacities related in this job field. He is able to drive other types of vehicles and could work in other fields of employment....He is a chronic TMJ patient and his activities will have to be limited to some degree.

(*Id.*).

### c. Non-examining Medical Sources

On June 27, 2006, state agency physician, Robert Hirsch, M.D., completed a Physical Residual Functional Capacity Assessment wherein he opined that Plaintiff could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently with the exception that Plaintiff could lift and carry with his left arm only occasionally or one-third of the time. (TR. 347-48). Plaintiff could also: sit and stand/walk about six hours each in an eight-hour work day with normal breaks; frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl; occasionally climb ladders, ropes and scaffolds; and occasionally crawl. (TR. *Id.*). Dr. Hirsch also found that Plaintiff was limited in pushing and/or pulling with his upper extremities and in reaching in all directions including overhead. (TR. 347, 349). Dr. Hirsch

1  further indicated that Plaintiff should avoid concentrated exposure to hazards such as

2  machinery and heights.  (TR. 350).

3           2.      Mental Impairment

4                a.      Examining Neuropsychologist

5       In April 2006, Plaintiff underwent examination by neuropsychologist Shannah

6  Biggan, Ph.D, ABPP, "to assess current cognitive and affective functioning...to assist in

7  planning for Vocational Rehabilitation service." (TR. 199).  Plaintiff reported to Dr. Biggan

8  that he underwent inpatient substance abuse treatment at the VA for three weeks in 1998.

9  (TR, 200).  He told Dr. Biggan that two weeks prior to his admission to the VA in 1998, he

10 consumed four to five beers daily, and "began to experience a feeling of 'losing control,'

11 with accompanying domestic violence and anger...."  (TR. 201).

12      Dr. Biggan noted that during the examination, Plaintiff's "[a]ffect was constricted and

13 mood was depressed and anxious."(TR. 201). Testing showed Plaintiff had "mild" depression

14 and a full scale IQ score in the low-average range.  (TR. 202, 204).  Plaintiff endorsed a

15 "mild level of depressive symptomatology, consistent with his report during interview.  He

16 endorsed as most pressing anhedonia, disinterest, instability, and attention and concentration

17 disturbance."  (TR. 204).  Dr. Biggan indicated that Plaintiff "had deficits in encoding and

18 storage of more complex material, and...deficits in executive functions.  He has difficulties

19 with organization, sequencing, alternating attention, problem-solving, and adapting to

20 shifting demands."  (TR. 205).  She also indicated that Plaintiff also "showed a number of

21 strengths which bode well for future vocational rehabilitation including memory, sustained

22 attention, processing speed, and motor speed. [Plaintiff]...would be considered a good

23 candidate for further vocational evaluation, although his current medical problems and

24 Workman's Compensation case may preclude him from working at the present time." (*Id.*).

25      Dr. Biggan diagnosed Plaintiff with two mental impairments: "Cognitive Disorder

26 NOS (executive system dysfunction)...[and] Major Depressive Disorder, single episode,

27 moderate." (*Id.*).

28

In discussing recommendations, Dr. Biggan noted that Plaintiff "endorsed a significant level of depression and agitations..." and "showed difficulty with mental flexibility and problem-solving. He would likely perform better with consistent and predictable demands and more familiar tasks." (TR. 206). She also noted that Plaintiff consumed two to three alcoholic beverages daily and she recommended that Plaintiff "should significantly reduce or discontinue alcohol use, as there is a strong likelihood that alcohol would exacerbate any cognitive problems he is presently experiencing and may contribute to additional symptoms of depression and anxiety." (TR. 206-07). She also recommended referral to a physical medicine and rehabilitation physician to determine the extent to which Plaintiff's current physical problems may interfere with future vocational rehabilitation, formal biofeedback, and exploration of psychopharmacological intervention to address depression. (TR. 206). She further recommended referral for vocational evaluation with specific focus on Plaintiff's interest in computer skills.[2] (*Id.*).

On July 16, 2008, licensed psychologist, James Armstrong, Ph. D., examined Plaintiff. (TR. 429-37). Plaintiff told Dr. Armstrong that he takes Vicodin which "impairs..." him and that he took some pain medication on the day of the visit. (TR. 430-31). "He states he is in pain right now - viz., 'chewing, cracking, noises [in jaw] all the time, both sides, makes my ears fill up with wax [sic].'" (TR. 430 (bracketed text in original)). However, Dr. Armstrong "saw no significant overt signs of physical pain today. Nor do I see any interference with speech due to jaw problems." (*Id.*). Plaintiff told Dr. Armstrong that he had been a "heavy drinker due to jaw problems....But not for several years. He last drank 2 days ago, 3

---

[2]In making this recommendation, Dr. Biggan stated that Plaintiff did express an interest in learning computer skills as an avenue for further vocational exploration. While he may have difficulty with complex sequencing and adapting to the changing demands of a training environment, his abilities to sustain attention, work quickly, and remember previous instructions will serve him well. Mr. Pennington should be referred for a moderate vocational evaluation with specific focus on his current interests to determine if any other aptitudes are present.
(TR. 206).

spritzers." (TR. 431). Plaintiff stated that he did "major shopping, such as at a large local supermarket..." by himself and he denied problems with handling finances or performing housework such as sweeping, taking out the trash, dishes or laundry. (TR. 433). Plaintiff also stated that he watches television and that his "[c]oncentration and attention are typically good for a 1 and a half hour sporting event." (*Id.*). He reads, goes to the American legion, and likes to fish and hunt, which he would be doing if he had money for licenses and gasoline. (*Id.*).

Upon examination, Dr. Armstrong noted that Plaintiff was alert, fully oriented, and able to provide personal historical information and discuss current events. (TR. 430-32). His affect was euthymic, and his speech was logical and normal. (TR. 431-32). During testing, Plaintiff's attention was good and he was not distractible. (TR. 434). Testing reflected that Plaintiff's IQ was within the average range. (TR. 436). Testing also indicated "[s]ubstantial to profound memory deficits...on all the immediate and delayed memory indexes" and Dr. Armstrong opined that "these scores are inconsistent with his ability to well recall personal date, even recent data." (*Id.*). Testing also reflected that Plaintiff had no significant difficulty in concentration, attention, shifting, and handling multiple tasks. (*Id.*).

Dr. Armstrong diagnosed: amnestic disorder not otherwise specified; alcohol abuse said to be in remission; mild to perhaps moderate adjustment disorder with depressed mood; and pain disorder. (*Id.*). Dr. Armstrong also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) wherein he indicated that Plaintiff was mildly impaired in his ability to: understand and remember simple instructions and to carry out simple instructions. (TR. 438). He also opined that Plaintiff was moderately impaired in his ability to: understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions. (*Id.*).

b.      Non-Examining Medical Sources

In June 2006, Paul Tangeman, Ph.D, a state agency psychologist, determined that Plaintiff did not have a medically determinable mental impairment. (TR. 332).

On January 11, 2007, Eugene Campbell, Ph.D., a state agency psychologist, indicated that Plaintiff suffered form a cognitive disorder and "mdd" which mildly restricted Plaintiff's activities of daily living, maintaining social functioning, and maintaining concentration and persistence of pace. (TR. 410). Dr. Campbell concluded that Plaintiff did not have a severe medically determinable mental impairment. (TR. 400).

### 3. Vocational Rehabilitation

On June 30, 2006, Rinley Gecosala, M.D., reviewed Plaintiff's case for a vocational rehabilitation evaluation. (TR. 354-59 *see* TR. 358 (Dr. Gecosala did not examine Plaintiff)). Plaintiff told Dr. Gecosala that he would like assistance in working in the computer field. (TR. 356). Dr. Gecosala found that Plaintiff had the following physical impairments: "temporomandibular joint disorder and its complication...", shoulder and lower back pain, and other pain disorders attributed to the August 2005 industrial accident involving Plaintiff. (TR. 357). Dr. Gecosala opined that Plaintiff should not be exposed to undue stress and trauma at work, "[o]therwise it is possible he will aggravate the pain and sufferings due to"...TMJ; he is limited as to performing overhead work and in lifting due to his left shoulder injury; he is limited in lifting due to his lower back, and Dr. Gecosala "suspecte[d] that he will have difficulty with stooping and bending, extensive walking and prolong [sic] standing." (TR. 357-58). Dr. Gecosala indicated that work in the computer field would be incompatible with Plaintiff's physical and mental limitations because such work requires a lot of sitting which is not compatible with Plaintiff's low back pain and it is highly questionable whether Plaintiff could perform the work given that his IQ is in the below-average range. (TR. 359). "Overall, working in [sic] area that is stressful and traumatic can aggravate his temporomandibular disorder. It can also aggravate or worsen the current depression and anxiety...." (*Id.*).

On December 21, 2007, Brent Emery, Plaintiff's vocational rehabilitation counselor, informed Plaintiff that Plaintiff's history of traumatic brain injury, TMJ, and shoulder/arm, back injuries will limit Plaintiff's ability to lift, stoop, and walk, stand and sit for prolonged periods. (TR. 465). Further pain from Plaintiff's "TMJ will cause distractions in your ability

to focus and concentrate." (*Id.*). Moreover, Plaintiff's "depression, anxiety and cognitive disruptions...will affect your executive processing, memory, social interactions, distractibility, concentration, and decision making ability." (*Id.*). Mr. Emery recommended that Plaintiff not attend school until his personal and disability problems are better managed, psychotherapy and pharmacology-therapy, and that Plaintiff should "check back...in a few months to review your situation." (TR. 466). Mr. Emery found that Plaintiff had "a lot of potential" given his positive personality and past employment success. (*Id.*).

C.    Lay Statements

Plaintiff's wife, Patricia Pennington, completed Function Reports in May 2006 and November 2006 with regard to Plaintiff. (TR. 151-58, 230-37). Mrs. Pennington stated that on a daily basis Plaintiff works on the computer, feeds their animals, and watches television. (TR. 151). He also assists with his father and grandmother. (TR. 152). He does housework such as laundry and the dishes as well as gardening, but it takes him a little longer than usual to perform these tasks.   (TR. 153; *see also* TR. 232).   Plaintiff is able to take care of his personal hygiene. (TR. 231). Mrs. Pennington indicated that Plaintiff's disability makes him short-tempered and he does not listen well. (TR. 156).  She further indicated that Plaintiff's disability affects his vision, concentration, and his ability to complete tasks and get along with others. (*Id.*).  Plaintiff is able to drive, go grocery shopping, pay bills, count change, handle a savings and checking account. (TR. 233).  He visits with family daily and enjoys watching television, fishing, and using the computer.  (TR. 234).

The record also contains a letter from Robert Forman, an attorney who has represented Plaintiff on various matters in the past and has been present on three occasions when Plaintiff was deposed and/or otherwise testified.  (TR. 280).  Mr. Forman has observed that Plaintiff

> has difficulties understanding questions and providing complete answers.  He struggles with his responses and his answers are often incomplete.  He does not recall information well because he has trouble remembering details.  He has difficulty understanding what is happening on his case, and I have had to repeat my explanations to him often.

(*Id.*).  Mr. Forman "believe[s] that [Plaintiff's]...pain and depression interfere with [h]is ability to function fully and inhibit his return to work in any capacity." (*Id.*).

Charmarie Frantz, CNA, Plaintiff's daughter-in-law, also submitted a letter wherein she stated that Plaintiff is unable to remain focused, sometimes withdraws from others, and feels frustration and anger about his inability to do things he once enjoyed such as hunting, working on the house, and eating certain foods. (TR. 281). Ms. Frantz also indicted that Plaintiff's "pain, and the medication he takes for it also influences his behaviors." (*Id.*). She stated that Plaintiff has "many good days and is a responsible, intelligent person." (*Id.*).

D.     The Vocational Expert's Testimony

At the December 16, 2008 hearing, Vocational Expert (hereinafter "VE") Ruth VanVleet testified. (*See* TR. 556-559). The ALJ posed the following hypothetical question to VE VanVleet:

> [A]ssume a hypothetical individual with the claimant's age, education, and work background. And assume that, that hypothetical individual is limited to light work in that he can frequently lift/carry up to 10 pounds and a maximum on an occasional basis lift 20 pounds. May stand, sit, and walk eight hours with normal breaks. Mentally the individual is moderately limited in his ability to understand, remember, and carry out complex instructions. And ability to make judgments on complex work related decisions. With those exceptions mentally all of the other categories of mental–that the mental categories are either, either there's no restriction whatsoever or they're mild. Can that hypothetical individual perform any part of the past relevant work performed by the claimant?

(TR. 556). The VE asked for clarification regarding mental limitations, and the ALJ stated that the limitations were moderate with regard to:

> Understanding and remembering, carrying out, and make [sic] judgments on complex work related decisions.

(TR. 557). The VE responded that Plaintiff's "past jobs were, as far as lifting, were in excess of the light work, so he couldn't do those." (TR. 556-57). However, according to the VE, Plaintiff could work as: a janitor, *Dictionary of Occupational Title* (hereinafter "DOT") number "323687014", which is light, unskilled work, of which there are 35,420 jobs available in Arizona and 2.3 million nationally; an assembler, DOT number "734687018", which is sedentary, unskilled work, of which there are 17,416 jobs available in Arizona and 361,000 nationally; and a "car vehicle washer,..." DOT number "915667010", which is light,

unskilled work, of which there are 73,812 jobs available nationally[3].(TR. 557-58). If Plaintiff was limited in his ability to sit for long periods of time, the VE would eliminate the assembler job. (TR. 558). Further, if the Plaintiff was unable to stay on task after thirty minutes or could not work more than ten hours a day, then he would be precluded from performing all of the thee jobs listed. (TR. 559). The VE testified that her answers were in accordance with the DOT. (*Id.*).

## B. The ALJ's Findings

### 1. Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied. *Id.* If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's

---

[3]The VE did not offer the number of positions in Arizona.

impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step. The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity (hereinafter "RFC")[4] to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied. *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(f). 416.920(f). At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines (hereinafter "grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988). The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983). However, because the grids are based on exertional or strength factors, the grids do not apply where the claimant has significant nonexertional limitations. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). When the grids do not apply, the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his May 29, 2009 decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since August 8, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: bilateral TMJ (temporomandibular joint) injuries secondary to a motorcycle accident at age 14 (1979); status post TMJ

---

[4]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

discectomies and placement of bilateral implants with removal of the implants in 1992; and left shoulder impingement syndrome (20 CFR 404.1520(c)).

\*\*\*

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

\*\*\*

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b). He can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit, stand and walk about 6 hours, each at a time, in an 8-hour workday. He can occasionally climb ladder/rope/scaffolds, and frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl. He has a limited ability to reach in all directions (including overhead). He should avoid concentrated exposure to unprotected heights and hazardous machinery.

\*\*\*

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

\*\*\*

7.      The claimant was born on August 1, 1965 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR Part 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      The claimant's acquired work skills do not transfer to other occupations within the residual functional capacity defined above. (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

\*\*\*

11.     The claimant has not been under a disability as defined in the Social Security Act since August 8, 2005 through the date of this decision (20 CFR 404.1520(g)).

<u>DECISION</u>

Based on the application for a period of disability and disability insurance benefits protectively filed on January 10, 2006, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(TR. 12-26).

III.    <u>DISCUSSION</u>

    A.    <u>Argument</u>

Plaintiff asserts that the ALJ's decision is erroneous for multiple reasons. Plaintiff takes specific issue with the ALJ's: findings concerning the range of light work; hypothetical question to the VE; failure to obtain the number of jobs available in the regional economy; failure to evaluate Dr. Hirsch's opinion; rejection of Dr. Harkins' and Dr. Wenaas' opinions; evaluation of Dr. Muncy's opinion; determination that Plaintiff's mental impairment was not severe; and evaluation of Plaintiff's credibility.

Defendant contends that the ALJ reasonably evaluated the medical evidence with regard to Plaintiff's physical and mental impairments, the ALJ was not required to ask the VE about the number of available jobs in the national economy, the ALJ properly assessed Plaintiff's credibility, and to any extent that the ALJ may have erred, such error was harmless. (Defendant's Brief, pp. 14-29).

    B.    <u>Standard of Review</u>

An individual is entitled to disability insurance benefits if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423, 1382. "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and

may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Id.* Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Id.*

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Id.* (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.    Analysis

The parties agree that, in the ALJ's opinion, Plaintiff could not perform the *full range* of light work. (*See* Plaintiff's Brief, pp. 7-9; Defendant's Brief, p. 15 n.4; Reply, p. 4). Additionally, although the ALJ determined that Plaintiff could work as an assembler, Defendant concedes that due to Plaintiff's limitation in his ability to reach, as found by the ALJ, the job of assembler, which "requires constant reaching," is inconsistent with the ALJ's RFC assessment. (Defendant's Brief, p. 26 n.7). Consequently, the assembler job is no longer considered a viable job for Plaintiff and the Court has not considered that job herein.

1.    The VE Testimony

Plaintiff contends that the ALJ's hypothetical question to the VE was defective because the ALJ did not include in the question Plaintiff's environmental limitations or Plaintiff's limitations on sitting, standing, walking, reaching, climbing, balancing, stooping, kneeling, crouching, crawling. When an ALJ uses a VE, the "[h]ypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant, including, for example, pain and an inability to lift certain weights." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (emphasis in original); *see also Burkhart v. Bowen,* 856 F.2d 1335, 1340 n.3 (9th Cir. 1988) (The VE's testimony "is only valuable to the extent that the question accurately portrays the claimant's individual physical and mental impairments.").

Defendant concedes that the ALJ erred when he omitted the following limitations from his hypothetical question to the VE:

- • limited ability to reach in all directions (including overhead);
- • occasional climbing of ladders, ropes, or scaffolds;
- • frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and
- • avoid concentrated exposure to unprotected heights and dangerous machinery; and
- • limited to sitting, standing, and walking to 6 hours each at a time[5]

(Defendant's Brief, pp. 25-27). However, Defendant contends that the error was harmless because the jobs of car washer and janitor[6] identified by the ALJ can be performed by Plaintiff despite the limitations set out in the RFC finding that were not mentioned to the VE. (*Id.*). For example, Defendant points out that the DOT job entries for car washer and janitor indicate that each job requires only frequent reaching, which means from one-third to two-thirds of the workday. (Defendant's Brief, p. 26). According to Defendant, "[s]ince two of the jobs at issue require frequent (rather than constant) reaching, they account for Plaintiff's 'limited' ability to reach." (*Id.*). However, as Plaintiff points out, Defendant has cited nothing to support his position that "when the ALJ found that Pennington had a 'limited

---

[5]Defendant concedes that the ALJ's hypothetical indicated that Plaintiff could stand, sit and walk eight hours a day with normal breaks. (Defendant's Brief, p. 27).

[6]Plaintiff, citing an uncertified copy of a transcript of the December 16, 2008 hearing, indicates that the VE's reference to the DOT number for the job of janitor was not clear on the record. (Plaintiff's Brief, p. 12 (*citing* TR. 511)). Plaintiff further points out that "[t]here are seven DOT occupations associated with the word 'janitor,' and none of them is both unskilled and exertionally 'light'", and such jobs are inconsistent with the ALJ's RFC finding. (*Id.* at pp. 12-13). Defendant does not specifically dispute that the "janitor" jobs cited by Plaintiff are incompatible with the ALJ's RFC finding. (*See* Defendant's Brief). However, the certified transcript reflects that the VE cited DOT number 323.687-014. (TR. 558). Such job number is assigned to: "Cleaner, Housekeeping". (*See* TR. 522-25). Plaintiff takes issue with the fact that the job number cited is not assigned to the job of "janitor". (*See* Reply, pp. 2-3). The record reflects that the VE used the word "janitor" in her testimony and that the ALJ referred to the job of "janitor" in his decision. For purposes of this Order, the Court presumes the certified transcript referred to the correct job number and that the VE and ALJ mistakenly stated "janitor" instead of "Cleaner, Housekeeping." For the reasons set forth, *infra*, remand is necessary for other reasons; however, the further proceedings on remand should include clarification of this issue.

- 23 -

ability to reach in all directions' (T[R]. at 21), the ALJ meant that Pennington could reach frequently...but not constantly." (Reply, p. 3; *see also Id.* at p. 5 ("The Commissioner cited no legal authority or evidence that a 'limited' ability to reach correlates with frequent reaching instead of occasional[7] reaching or some other limitation.")). The substantial evidence of record reflects that both of the jobs that Defendant contends Plaintiff can perform require *frequent* reaching and, yet, there is nothing to support the conclusion that the ALJ's RFC limitation on reaching in all directions limited Plaintiff to only frequent reaching.

Additionally, with regard to the RFC assessment on Plaintiff's ability to sit, stand, and walk, Defendant posits that the ALJ's hypothetical question to the VE included that Plaintiff would have normal breaks within an eight hour day, and, thus, there is no practical difference between the ALJ's hypothetical question and his RFC assessment.. (Defendant's Brief, p. 27). Defendant points out that regular work breaks include a "'morning break, a lunch period, and an afternoon break at approximately 2-hour intervals" (*Id.* (*quoting* SSR 96-9p)) and that "'[p]ersons who can adjust to any need to vary sitting and standing by doing so at breaks[,] lunch periods, etc., would still be able to perform a defined range of work". (*Id.* (*quoting* SSR 83-12)). Defendant, therefore, argues that "Plaintiff would not ever have to sit or stand more than two hours at a time." (*Id.*).

Defendant's argument focuses on the intervals of time that Plaintiff may be required to sit, stand and walk. Defendant's response fails to take into account total sitting, standing, and walking per workday specified in the hypothetical question. If Defendant's position is the case, then the question becomes why the ALJ felt the need to word the RFC assessment to specify that Plaintiff was limited to sitting, standing, and walking "about 6 hours, each at a time, in an 8-hour workday." (TR. 21). The ALJ's RFC assessment implies that Plaintiff can sit, stand and walk, each alone or in combination (hence the conjunctive "and"), for six hours at a time in total during an 8-hour workday. Defendant cites to SSR 96-9p, which

---

[7]"Occasionally" means occurring from very little up to one-third of the time. *See* SSR 83-10).

provides in pertinent part, that "to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SSR 96-9p. This statement appears to take into account break periods at two-hour intervals within the total six hours of sitting during the workday. In the instant case, the ALJ's RFC assessment does not mention break periods. However, if Defendant's position is correct that it is customary for break periods to occur every two hours, then it follows that the ALJ's RFC assessment would automatically infer a break period every two hours as well. Thus, any hypothetical question based on the ALJ's RFC assessment would have included that Plaintiff could sit, stand and walk about six hours, each a time, presuming normal breaks in an 8-hour workday. This question is different from that actually asked of the VE regarding a claimant who can sit, stand, and walk eight hours with normal breaks. Whether the answer to the question incorporating Plaintiff's actual RFC assessment would be materially different from the VE's answer to the question of record, remains to be seen.

Defendant also maintains that the RFC finding that Plaintiff avoid concentrated exposure to unprotected heights and hazardous machinery have no impact on the jobs of car washer and janitor/cleaner. (Defendant's Brief, p. 27). However, the DOT for 915.667-010 "Car-Wash Attendant, Automatic" is clear that such employee:

> Performs any combination of [sic] following duties in automatic car wash: Directs patron to entrance of wash station or guides automobile onto wheel track of automatic mechanism. Cleans front and rear of vehicle, using brush and detergent. *Activates wash mechanism and observes operation to detect equipment malfunctions.* Notifies supervisor when malfunctions occur. Receives payment from customer or issues change for coin-operated equipment. *Fills detergent and wax tanks, lubricates equipment, and replaces spray jets and hoses as needed.* May vacuum interior of automobile.

(TR. 518 (emphasis added)). The job involves interaction with machinery. Whether the machinery can be considered hazardous is unclear. Moreover, if the machinery is hazardous, then whether Plaintiff's limitation would materially erode the occupational base jobs is equally unclear.

The DOT listing for 323.687-014, Cleaner, Housekeeping includes that such employee

would hang drapes and also perform duties as described under "Cleaner (any industry) I Master Title" (TR. 522) which includes: cleaning draperies; washing walls, ceiling, and woodwork; washing windows, door panels, and sills; and replacing light bulbs. *See* 1991 WL 645969. Thus, as Plaintiff persuasively argues, such tasks could expose him to unprotected heights. (*See* Reply, p.6). The record is unclear as to whether the occupational base would be significantly eroded by such a limitation. These issues must be explored with the vocational expert in the first instance.

The Ninth Circuit has deemed an ALJ's error harmless where the error was inconsequential to the ultimate nondisability determination. *See Stout v. Commissioner of Social Security,* 454 F.3d 1050, 1055 (9th Cir. 2006). Defendant bears the burden of establishing that Plaintiff could perform jobs existing in significant numbers. *See* 20 C.F.R. §404.1512(g). The record is clear that the ALJ never explored the issue of Plaintiff's limitation on reaching with the VE. The record is unclear as to whether the ALJ was aware that these two remaining jobs involved frequent reaching. The record is equally unclear as to the extent of Plaintiff's limitation on reaching in all directions, including overhead. Additionally, the record is unclear as to whether the VE's testimony fully takes into account the restriction with regard to Plaintiff's sitting, standing and walking. Moreover, there is no showing on the record that Plaintiff's restrictions with regard to hazardous machinery and unprotected heights would render him able to perform the jobs identified by the ALJ and whether Plaintiff's restrictions would erode the number of available jobs. Without further exploration about these restrictions with regard to the jobs identified by the ALJ, the Court cannot confidently say that the ALJ's omission of these restrictions was inconsequential to the ultimate nondisability determination.

Plaintiff's Reply does not specifically take issue with Defendant's response concerning other limitations included in the RFC assessment but omitted from the hypothetical question. The Court declines to address whether this omission constitutes harmless error. However, because the matter must be remanded for further development, as discussed *infra,* and because the law is clear that hypothetical questions posed to the VE

must include all of Plaintiff's limitations and restrictions, the hypothetical question posed to the VE on remand should set out all limitations specified in the ALJ's ultimate findings. *See Embrey,* 849 F.2d at 422

Plaintiff also points out that neither the ALJ's RFC assessment nor his question to the VE involved Dr. Hirsch's limitation on Plaintiff's ability to lift and carry objects with his left arm. Non-examining Dr. Hirsch opined, among other things, that Plaintiff could lift and carry objects with is left arm "occ[asionally], or ⅓ of the time." (TR. 348); *see also* SSR 83-10 ("Occasionally" means from very little up to one-third of the time); 20 C.F.R. §404.1567(b) (light work requires lifting and carrying 20 pounds occasionally and up to 10 pounds frequently). The ALJ gave "evidentiary weight" to Dr. Hirsch's opinion and incorporated most of Dr. Hirsch's restrictions and recommendations into Plaintiff's RFC assessment. (TR. 24; *see also infra,* at n.9). Defendant concedes that the ALJ did not mention this limitation in his decision or to the VE, but argues that Plaintiff has not shown "that he could not use his unaffected right arm for any required lifting or carrying beyond 'occasional', especially since such lifting or carrying would involve no more than 10 pounds." (Defendant's Brief, p. 19).

Additionally, examining Dr. Wenaas opined that Plaintiff should not perform work that was physically traumatic or stress inducing. (TR.363; *see also* TR. 360 ("The physical limitations...are obviously that of joint of impact from bouncing and other similar movements."). Dr. Wenaas explained that the basis for these restrictions involved Dr. Harkins' attempt to maintain a balance in Plaintiff's bite and relieve the joints from pressure. (TR. 363). The ALJ gave "great weight" to examining Dr. Wenaas' opinions. (TR. 24). Plaintiff takes issue with the fact that the ALJ did not include Dr. Wenaas' limitations in the RFC assessment or mention them to the VE. Defendant argues that such omission was inconsequential given that "[t]he car washer and janitor jobs the ALJ identified are not physically traumatic or stressful; to the contrary, both jobs are minimally-demanding unskilled and light work performed in non-production line settings." (Defendant's Brief, pp.18-19). There is no evidentiary support in the record for the conclusion that the jobs are

not stress inducing or physically traumatic. To the contrary, the job of janitor/cleaner involves use of powered scrubbing and waxing machines to clean carpets, rugs, upholstered furniture, and draperies. DOT Master Titles and Definition, Cleaner, 1991 WL 645969.

Because the VE should be advised of all of Plaintiff's limitations, and because remand is required to present the VE with other limitations omitted by the ALJ as discussed *supra*, the restriction on Plaintiff's ability to lift with his left arm as well as the need for him to avoid joint impact or stress should be explored with the VE on remand.

Plaintiff also argues that the VE testimony is lacking with regard to the car washer job because the ALJ obtained national but not regional job incidence data. (Plaintiff's Brief, p. 14). Defendant argues that regional information is not required. (Defendant's Brief, pp. 28-29).

The Social Security Act provides that a person is disabled if

his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A). *See also* 20 C.F.R. §404.1566(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not mater whether...[w]ork exists in the immediate area in which you live."); *Martinez v. Heckler,* 807 F.2d 771, 775 (9th Cir. 1986) (same). The Ninth Circuit has affirmed the ALJ's finding that the plaintiff could work based on available jobs "in all regions of the national economy." *Mayes v. Massanari,* 276 F.3d 453, 461 (9th Cir. 2001). However, *Mayes* did not involve a challenge to reliance solely on national numbers. "In practice, the principal significance of the 'other regions' language in the statute is to prevent the Social Security Administration from denying benefits on the basis of 'isolated jobs that exist only in very limited numbers in relatively few locations

- 28 -

outside of the region where [the applicant] live[s].' 20 C.F.R. § 404.1566(b)." *Barrett v. Barnhart,* 368 F.3d 691, 692 (7th Cir. 2004) (recognizing that the courts have not interpreted the statute uniformly). In contrast to the instant record, "[t]he better practice would be to establish that there is a sufficient number of jobs in claimant's region or more than one region in the country. This would comport with the language of the statute and the regulations." *Espejo v. Astrue,* 2009 WL 1330799, *5 (C.D. Cal. May 11, 2009). Remand is necessary for other matters. On remand, the parties may explore the regional numbers for the jobs identified by the VE.

### 2. Dr. Harkins' Opinions Predating 2009

Dr. Harkins is a dentist whose letterhead indicates he is a "Diplomat, American Board of Orofacial Pain" and that he practices in the area of "Temporomandibular Disorders and Orofacial Pain". (TR. 384). The record contains an August 25, 2006 form, which the ALJ attributed to Dr. Harkins, indicating that Plaintiff was unable to perform his previous work as a truck driver but that he was not precluded from performing other work, including light level work. (TR. 377). In December 2007, Dr. Harkins opined that Plaintiff's TMD prevented Plaintiff from driving or operating equipment to avoid bouncing and jarring of his jaw and neck. (TR. 444). Dr. Harkins considered the effect of Plaintiff's medication, including pain and anxiety medication and muscle relaxers, on Plaintiff's ability to work and concluded that Plaintiff "essentially needs to have a job that creates no risk to himself or others if he is taking medications."[8] (*Id.*). The ALJ gave "controlling weight..." to Dr. Harkins' August 25, 2006 opinion (TR. 20), and "great weight" to Dr. Harkins opinions from May and December 2007. (TR. 24 (also giving great weight to Dr. Harkins' August 25, 2006 opinion)). Plaintiff argues that the ALJ improperly gave controlling weight to Dr. Harkins' August 2006 opinion because it was not signed by Dr. Harkins and because it did not show

---

[8]Specifically, because of the medications, Dr. Harkins indicated that Plaintiff should avoid driving or operating dangerous equipment, climbing steps and ladders, walking on elevated walkways and ramps, or be in a situation where he can fall or drop objects on other people. (TR. 444).

that Plaintiff's shoulder injury was taken into account, or that Plaintiff could work eight hours a day, five days per week or an equivalent work schedule. (Plaintiff's Brief, pp. 16-17).

Plaintiff argues that the August 25, 2006 opinion cannot be attributed to Dr. Harkins because he did not sign it. The first page of the form indicates that it is to be completed by Plaintiff's physician and phrases inquiries in paragraphs 1 though 7 in terms of seeking information about the "patient". (TR. 377). The first page does not request a signature. The second page, paragraphs 8 through 11, directs questions to the patient himself. (TR. 378). Therein, Plaintiff, who signed the second page, indicated that his treating physician is Dr. Harkins. (*Id.*). Given Plaintiff's statement identifying his treating physician as Dr. Harkins together with the fact that the answers on the first page are consistent with Dr. Harkins' prior opinions that Plaintiff could not return to his job driving trucks as well as his December 2007 opinion that Plaintiff should avoid driving, it was reasonable to presume that Dr. Harkins completed the first page.

In responding to Plaintiff's other arguments, Defendant contends that Dr. Harkins,

> as a dentist...is not an 'acceptable medical source' under the Commissioner's regulations. *See* 20 C.F.R. §404.1513(a); Social Security Ruling (SSR) 06-3p. As such Dr. Harkins could not establish the existence of a medically determinable impairment, provide a 'medical opinion,' or be considered a treating source (whose medical opinions may be entitled to 'controlling' weight). SSR 06-3p. The ALJ was still required to consider evidence from Dr. Harkins and did so. (TR. 24).

(Defendants' Brief, pp. 16-17).

In sum, Defendant contends that testimony from Dr. Harkins is essentially that of a lay witness and Plaintiff, in his Reply, does not challenge Defendant on this issue. According to Defendant, under the regulations, Dr. Harkins' opinions cannot be given controlling weight despite his area of expertise in temporomandibular disorders and orofacial pain. Defendant's position calls into question the ALJ's decision which expressly gave "controlling weight" to Dr. Harkins' August 2006 opinion and reflects that the ALJ applied the regulation governing treating source opinions in doing so. (*See* TR. 20 (*citing* 20 C.F.R. §404.1527(d)(2)).

The Social Security Administration recognizes that the fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source". SSR 03-6p. However, such factor may not always govern. *See* SSR 03-6p. Instead,

> depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. *Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."*

SSR 06-3p (emphasis added). Therefore, the ALJ could give more weight to Dr. Harkins' opinion than to opinions from "acceptable medical sources." *Id.* This is especially true given Dr. Harkin's area of practice and the length and scope of his treatment relationship with Plaintiff. Plaintiff's only other treating doctor, Dr. Muncy, made clear that he was "not an expert in that field" of TMJ issues. (TR. 318). However, nothing in the record supports the conclusion that the ALJ was aware that he was attributing great weight and controlling weight to a medical source who was not an acceptable medical source when he attributed such weight to Dr. Harkins' opinion. Moreover, Defendant concedes that the ALJ accorded such weight to Dr. Harkins' opinions because the ALJ mistakenly considered Dr. Harkins an acceptable treating medical source.

Even assuming that the ALJ erred, the record does not support the conclusion that this error worked to Plaintiff's detriment. For example, the ALJ did not accept Dr. Harkins' August 25, 2006 opinion or his other pre-2009 opinions over a more favorable opinion from any physician of record. Dr. Muncy, Plaintiff's treating physician, indicated that Plaintiff could return to regular work, with no listed restrictions, as of October 2005. (TR. 460). Examining Dr. Wenaas, indicated that Plaintiff could work "in other fields of employment..." as long as he avoided "joint impact from bouncing and other similar movements." (TR. 360).

That recommendation is akin to Dr. Harkins' restriction on driving. Further, non-examining Dr. Hirsch, like Dr. Harkins, also found that Plaintiff was capable of performing a range of light level work. (TR. 346-351). The ALJ adopted many, but not all, of the exertional, postural, manipulative, and environmental limitations identified by Dr. Hirsch, which took into account Plaintiff's shoulder issues.[9] (*Compare id. with* RFC assessment at TR. 21). Of the limitations recommended by Dr. Hirsch that were adopted by the ALJ, some of the limitations were more restrictive than those identified by Dr. Harkins and some were less.[10] Plaintiff argues: "the Commissioner tacitly conceded that the ALJ erroneously gave 'controlling weight' to an opinion that the ALJ believed supported his residual functional capacity assessment....When the Commissioner accepts that an ALJ erroneously gave controlling weight to an opinion that the ALJ believed doomed a claimant's disability claim, the proper remedy is remand for the proper evaluation of that opinion." (Reply, p. 9). It is troubling that the ALJ accorded controlling weight to a person whom Defendant argues was not entitled to such weight. Yet, there is no evidence in the record to support the conclusion that, had the ALJ considered Dr. Harkins as a lay witness instead of an acceptable medical

---

[9]Dr. Hirsch limited crawling to "occasionally" (TR. 348); whereas, the ALJ found Plaintiff could crawl "frequently". (TR. 21). Dr. Hirsch also noted limitations in pushing and pulling with the upper extremities (TR. 347) that were not mentioned by the ALJ. Plaintiff has not raised these differences in challenging the ALJ's decision. Also, as discussed *supra*, the ALJ did not mention Dr. Hirsch's limitation on Plaintiff's ability to lift with his left arm.

[10]For example, Dr. Harkins opined that Plaintiff could stand, sit and walk up to eight hours per day with breaks. (TR. 377). Whereas, Dr. Hirsch limited Plaintiff to six hours per day with normal breaks. (TR. 347). Where Dr. Harkins opined that Plaintiff should avoid climbing steps and ladders and walking on ramps, (TR. 444), Dr. Hirsch found Plaintiff could frequently climb ramps and stairs and could occasionally climb ladders. (TR. 348). Dr. Hirsch also assessed other exertional, postural, manipulative restrictions not discussed by Dr. Harkins. Other than the limitation to light work, the ALJ did not advise the VE of any of the other restrictions identified by either Dr. Hirsch or Dr. Harkins.(TR. 556). The ALJ's RFC assessment included some but not all of the restrictions identified by Dr. Hirsch and did not include Dr. Harkins' restrictions on ramps and stairs. (TR. 21). Nor did the ALJ provide any reason for rejecting Dr. Harkins' recommendation. Plaintiff does not raise this issue as a reason to support remand.

source, the RFC assessment and ultimate disability determination would have been any different. Although the ALJ gave "controlling weight" to Dr. Harkins August 25, 2006 opinion, the ALJ ultimately adopted the majority of the recommendations of non-examining Dr. Hirsch which took into account Plaintiff's shoulder and back issues and, for the most part, were more restrictive than those suggested by Dr. Harkins' and treating Dr. Muncy.

### 3. Dr. Harkins' January 2009 Opinion and Plaintiff's Mental Impairment

In January 2009, Dr. Harkins clarified that, in his December 2007 assessment, he did not consider Plaintiff's psychological or cognitive issues. (TR. 474). Dr. Harkins further indicated that he had observed Plaintiff's poor memory and cognitive functioning on numerous occasions and, taking this into account, Plaintiff's limitations for future employment would be even more restricted. (*Id.*). The ALJ rejected Dr. Harkins' January 2009 opinion as conclusory, as lacking substantial support from his previous determinations, and on the basis that Dr. Harkins, who wrote the letter upon request of Plaintiff's counsel, may have written the letter out of sympathy for Plaintiff or to avoid "unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (TR. 20-21). Plaintiff argues that the ALJ improperly rejected Dr. Harkins' January 2009 opinion. (Plaintiff's Brief, p. 16).

In rejecting Dr. Harkins' January 2009 letter, the ALJ observed that the letter "was written at the request of the claimant's attorney in an effort to generate evidence for the claimant's current appeal." (TR. 20). When the ALJ rejected Dr. Harkins' opinion, he considered Dr. Harkins to be a treating specialist. (*See* TR. 19 (ALJ describing Dr. Harkins as Plaintiff's orofacial pain specialist)). Now, Defendant concedes that Dr. Harkins is a lay witness. A medical report cannot be rejected solely on the basis of the reason for which it was obtained. *See Reddick,* 157 F.3d at 726 ("We clarify that, in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it."); *Nguyen v. Chater,* 100 F.3d 1462, 1464 (9th Cir. 1996) ("We have held the source of a referral to be relevant where

there is no objective medical basis for the opinion,... and where there is evidence of actual improprieties on the part of the doctor whose report the ALJ chooses to reject.") (citations and internal quotations omitted).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel,* 236 F.3d 503, 511-12 (9th Cir. 2001)(citations omitted).

Other than his January 2009 letter, Dr. Harkins' treatment notes and records do not note observation of Plaintiff's cognitive or psychological issues.  Yet, Dr. Harkins is clear in his January 2009 letter that he has "observed [Plaintiff]...on numerous occasions and his memory is poor.  His cognitive function is also poor." (TR. 474).  Moreover, contrary to the ALJ's assertion that Dr. Harkins' observations "depart[] substantially from the rest of the evidence of record,...", the record supports the conclusion that this is not necessarily the case.

In April 2006, Plaintiff was examined by Dr. Biggan who diagnosed Cognitive Disorder NOS (executive system dysfunction) and Major Depressive Disorder, single episode, moderate.  (TR. 205).  She found that Plaintiff "endorsed a significant level of depression and agitation...", had difficulty with mental flexibility and problem solving, and would perform better with consistent and predictable demands and more familiar tasks.  (TR. 206).  The ALJ rejected Dr. Biggan's opinion because Dr. Biggan's assessment "appear[ed] to rely in part on an assessment of impairments for which the claimant received no actual treatment from..." Dr. Biggan, whom the ALJ identified as a "treating source[]." (TR. 18).

However, the record does not reflect that Dr. Biggan was a treating source.  Dr. Biggan makes clear in her report that Plaintiff was referred to her "for a neuropsychological evaluation to assess current cognitive and affective functioning.  Specifically, results were requested to assist in planning for Vocational Rehabilitation services." (TR. 199).  There is no indication that Dr. Biggan expected to or attempted to assume the role of a treating source with Plaintiff. *See Regennitter v. Commissioner of Social Security Admin.,* 166 F.3d 1294, 1299 (9th Cir. 1999) (doctor who was neither asked nor paid to provide treatment for the claimant, but rather to give an objective opinion about his medical condition was an

examining doctor);  20 C.F.R. §404.1502 (defining "nontreating source" as a physician, psychologist or other acceptable medical source who has examined the claimant but does not have an ongoing treatment relationship with the claimant).   Nor is there any indication on the record that Plaintiff refused treatment from any source for his mental impairment,[11] although the record does reflect that Plaintiff was having issues with his medical insurance and had lost it. (TR. 314 (Dr. Muncy noting Plaintiff has no insurance for physical therapy and that Plaintiff is getting an attorney to try to get his previous insurance back); TR. 318 (Dr. Muncy noting that Plaintiff lost his insurance)). *See Regennitter,* 166 F.3d at 1299 (the claimant's failure, because of poverty, to seek treatment by any mental professional was not a valid reason to reject examining doctor's opinion). The Ninth Circuit has rejected an ALJ's reliance on an examining doctor's "failure to refer [the claimant] for hospitalization  or treatment" because the ALJ's reason "ignores the well-established distinction between an examining and a treating doctor." *Regennitter,* 166 F.3d at 1299.  Dr. Biggan "was neither asked, nor paid, to provide treatment for...[Plaintiff], but rather to give an objective opinion about his medical condition." *Id.*   "The opinion of an examining physician is...entitled to greater weight than the opinion of a nonexamining physician." *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995) (citations omitted).  An ALJ may reject the uncontradicted opinion of an examining physician by providing "clear and convincing" reasons. *Id.*  An ALJ may reject the contradicted opinion of an examining physician by stating "specific and legitimate

_____

[11]Even if this were the case, the sole fact that a claimant did not seek treatment recommended by a doctor does not necessarily undermine that doctor's objective opinion about an existing condition.  Instead, such evidence could undermine the claimant's credibility. *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007)(whether the claimant failed to follow, without adequate explanation, a prescribed course of treatment may be considered in assessing claimant's credibility).  However, the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Regennitter,* 166 F.3d at 1299-1300 (*quoting Nguyen,* 100 F.3d at 1465).

reasons that are supported by substantial evidence in the record." *Id.* at 830-31; *see also Magallanes,* 881 F.2d at 751 ("The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.")(internal citation and quotation marks omitted). The ALJ has not met either standard in this case. "[W]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as 'a matter of law.'" *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)(*quoting Lester,* 81 F.3d at 834)).

Plaintiff was also examined by Dr. Armstrong who diagnosed Amnestic Disorder NOS, alcohol abuse said to be in remission, mild to moderate adjustment disorder with a depressed mood, and pain disorder associated with both psychological factors and a general medical condition. (TR. 436). Dr. Armstrong's testing reflected substantial to profound memory deficits although this was inconsistent with Plaintiff's ability to remember personal data. (*Id.*). He found Plaintiff was not impaired with regard to making judgments on simple work-related decisions. (TR. 438). He found Plaintiff was mildly impaired regarding understanding, remembering and carrying out simple instructions. (TR. *Id.*). He found Plaintiff was moderately impaired in his ability to understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions. (*Id.*). The ALJ noted that Dr. Armstrong found that Plaintiff was capable of performing simple, unskilled work. (Tr. 18).

Non-examining Doctors Campbell and Tangeman, concluded that Plaintiff did not suffer from a severe mental impairment. (TR. 332, 410). Dr. Campbell found Plaintiff to be mildly limited in three areas. (TR. 410). To support his conclusion that Plaintiff's impairment was not severe, Dr. Campbell cited Dr. Biggan's statement that Plaintiff could succeed in computer training, and examining Dr. Wenaas' statement that Plaintiff could work in other fields. (TR. 412). The ALJ "accorded evidentiary weight to..." non-examining Drs. Tangeman and Campbell. (TR. 18). He also found that examining Dr. Armstrong's opinion was "not inconsistent with the other substantial evidence." (*Id.*). The ALJ ultimately

concluded that Plaintiff's mental impairment was not severe although Plaintiff did have mild mental limitations. (*Id.*).

The ALJ included in his hypothetical question to the VE that Plaintiff "was moderately limited in his ability to understand, remember, and carry out complex instructions. And ability to make judgments on complex work related decisions." (TR. 556). The ALJ did not specifically mention these limitations in his written decision. The ALJ's question to the VE along with his acceptance of Dr. Armstrong's opinion call into question his rejection of Dr. Harkins' 2009 opinion because it "departs substantially from the rest of the evidence of record...." (TR. 21). Dr. Harkins noted that Plaintiff had poor cognitive function and poor memory and Dr. Armstrong found Plaintiff was limited in some areas regarding memory of complex instructions and the ability to make complex judgments and decisions. (*See* TR. 438). He ultimately diagnosed Plaintiff with Amnestic Disorder not otherwise specified. (TR. 436). Moreover, Dr. Biggan's report, which was erroneously rejected, also cited cognitive problems, although she found Plaintiff's memory a strength.

Defendant denies that the ALJ erred at step two in concluding that Plaintiff's mental impairment was not severe. "Step two...is 'a de minimis screening device used to dispose of groundless claims...." *Webb v. Barnhart,* 433 F.3d 683, 686-87 (9th Cir. 2005) (*quoting Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996)). At step two, "[a]n impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb,* 433 F.3d 683, 686-87 (9th Cir. 2005) (*quoting Smolen,* 80 F.3d at 1290 (emphasis in original)). An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs..." including: understanding, carrying out, and remembering simple instructions; *use of judgment*; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §404.1521(b)(3)-(6). "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his

conclusion is 'clearly established by medical evidence.'" *Webb,* 433 F.3d at 687 (*quoting* SSR 85-28). Herein, the ALJ did not reject Dr. Armstrong's opinion that Plaintiff was moderately limited in understanding and remembering complex instructions, carrying out complex instructions, and the ability to make *judgments* on complex work-related decisions.

According to Defendant, even if there was error, it was harmless because the ALJ took into account Plaintiff's impairments, both severe and non-severe, in concluding that Plaintiff could perform unskilled jobs which, by their definition, require little judgment to do simple duties that can be learned on the job in a short period of time. (*See* Defendant's Brief, p.22 (*citing* 20 C.F.R. §404.1568(a) (defining unskilled work)). Defendant is correct that the ALJ's hypothetical question recognized Plaintiff's limitations with regard to making judgments on complex work-related decisions and ability to understand, remember and carry out complex instructions. With such limitations in mind, the jobs the VE identified, and the ALJ adopted, were unskilled.

The record does not clearly support the conclusion that had the ALJ considered Dr. Biggan's opinion together with the other evidence of record, his step two finding would have been the same. The Ninth Circuit has held that an ALJ's error at step two in finding an impairment non-severe is harmless where the ALJ considers at step 4 any limitations imposed by that impairment. *Lewis v. Astrue,* 498 F.3d 909 (9th Cir. 2007). In *Lewis,* the ALJ "extensively discussed..." the medical record regarding the relevant impairment at step four and the ALJ's "decision reflect[ed] that the ALJ considered any limitations posed by the [impairment] at Step 4." *Id.* Here, although the ALJ may have accounted for Dr. Armstrong's limitations at step four, it is not entirely clear on the record that the mental limitations the ALJ mentioned to the VE also accounted for Dr. Biggan's opinion as well. Unlike *Lewis,* where the ALJ extensively discussed the medical record at step four and accounted for any limitations caused by the impairment, the ALJ did not fully consider Dr. Biggan's report when assessing Plaintiff's impairment. The record does not support the conclusion that the ALJ's erroneous rejection of Dr. Biggan's report was inconsequential to the ultimate nondisability determination. Because the ALJ's improper rejection of Dr.

Biggan's report leaves open the issue of Plaintiff's mental impairment, Dr. Harkins' January 2009 opinion, which was also improperly rejected, should also be reconsidered as well.

### 4. Dr. Muncy's Opinions

Because Dr. Muncy stated he was not a specialist in TMJ, Plaintiff also objects to the fact that the ALJ accorded "great weight" to Dr. Muncy's opinions. (Plaintiff's Brief, p. 18 (*citing* TR. 318)). Defendant, relying on his position that Dr. Harkins is not an acceptable medical source, asserts that the ALJ "reasonably discounted Dr. Harkins' [January 2009] statement while according great weight to the medical opinion of Dr. Muncy." (Defendant's Brief, p. 18). Both parties ignore the fact that the ALJ expressly stated that he gave "great weight" to the pre-2009 opinions of Dr. Muncy, Dr. Harkins and Dr. Wenaas (TR. 24) and that he gave "controlling weight" to Dr. Harkins' August 25, 2006 opinion (TR. 20). Although the ALJ also expressly rejected Dr. Harkins' January 2009 opinion, other than the ALJ's reference to "the rest of the evidence of record", (TR. 21) there is nothing showing that the ALJ rejected Dr. Harkins' opinions in favor of Dr. Muncy's. In sum, even though the ALJ accorded "great weight" to Dr. Muncy's opinions, the ALJ's ultimate findings imposed more restrictions than Dr. Muncy recommended and, in turn, resulted in the conclusion that Plaintiff could not return to his past work even though Dr. Muncy recommended otherwise. If there was error, it was inconsequential to Plaintiff.

### 5. Credibility

The ALJ concluded that Plaintiff's "testimony with regard to the severity and functional consequences of his symptoms is not fully credible." (TR. 24). Plaintiff argues that the ALJ did not adequately account for the fact that Plaintiff's activities did not approach the level of full-time work at a limited light exertional level. (Plaintiff's Brief, p. 19). Plaintiff cites his statements in the record referring to periods of rest and performing tasks at a slower pace. (*Id.* (*citing* TR. 224, 503)).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue,* 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where the

claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing. *Tomasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008); *Orn,* 495 F.3d at 635*; Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006). Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen,* 80 F.3d at 1284; *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Lingenfelter,* 504 F.3d at 1040; *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.").

Further, the Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)); *see also Fair,* 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the work place...."); *Vick v. Commissioner of the Social Security Admin.*, 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("[i]f a claimant's activity is in harmony with [his] disability, the activity does not necessarily

indicate an ability to work."). The question is whether the plaintiff spends a "'substantial part of his day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting....' Thus, if a claimant is capable of performing activities including household chores, 'that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working.'" *Vick,* 57 F.Supp.2d at 1085-86 (*quoting Fair,* 885 F.2d at 602)(emphasis in original).

The ALJ properly considered Plaintiff's daily activities which included caring for his personal needs, driving, doing a variety of housework, cooking, shopping, using a computer, reading, caring for his family members, spending time outdoors, spending time hunting and fishing "as often as...[he] can", and spending time with others. (TR. 24). The ALJ found that "the physical and mental requirements of these household tasks and social interactions are consistent with a significant degree of overall functioning." (*Id.*). Plaintiff contends that, because the ALJ erroneously evaluated the medical evidence, substantial evidence of record does not support his related credibility finding. (Plaintiff's Brief, p. 9).

Plaintiff indicated that it was difficult for him to stay focused and that he experiences stress. (TR. 225, 228, 553-54). Dr. Armstrong diagnosed Amnestic Disorder, not otherwise specified. (TR. 436). Dr. Biggan found that Plaintiff had difficulties with alternating attention, problem-solving, adapting to shifting demands, organization and sequencing. (TR. 205). The ALJ did not accord any weight to Dr. Biggan's report. Nor did he take into account Dr. Harkins' lay opinion that Plaintiff had poor memory and poor cognitive functioning. Both statements support, to some degree, Plaintiff's symptom allegations. Moreover, Plaintiff's daily activities may not necessarily be inconsistent with such symptoms. Plaintiff's symptom allegations should be assessed in light of the record as a whole, including Dr. Biggan's and Dr. Harkins' statements.

6.    Remand

Plaintiff requests that the Court remand that matter for further administrative proceedings. (Plaintiff's Brief, p. 20).

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d at 1178. The ALJ's failure to fully inform the VE of all of Plaintiff's physical and mental restrictions negates the ALJ's reliance on the jobs identified by the VE. Moreover, remand is necessary for proper evaluation of Dr. Biggan's report and Dr. Harkins' January 2009 letter and for reconsideration of Plaintiff's credibility in light of the entire record presented on remand.

## IV.    CONCLUSION

For the foregoing reasons, remand for further administrative proceedings is appropriate. Accordingly,

IT IS ORDERED that the Commissioner's final decision in this matter is REMANDED for further proceedings consistent with this Order. The Clerk of Court is instructed to enter judgment accordingly and close this case.

DATED this 30th day of September, 2011.

_____
Héctor C. Estrada
United States Magistrate Judge